IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JENNIFER J. DANE,<br><br>      Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA<br><br>      Defendant. | **No. 4:11-cv-00568 – JEG**<br><br>**O R D E R** |

This matter is before the Court following a bench trial held on March 17 and 18, 2014. Attorney Robin L. Hermann represented Plaintiff Jennifer J. Dane (Dane). Attorney William C. Purdy represented Defendant United States of America (Defendant). The Court heard testimony from Dane; Dane's father, Richard Dane (Richard); Dane's mother, Shirlene Dane (Shirlene); Kathy Wagner (Wagner); Alan Rothstein, D.P.M., FACFAS (Dr. Rothstein); David Utley (Utley); Lowell Scott Weil, Sr., D.P.M. (Dr. Weil); and Suzie Berregaard (Berregaard).

Dane filed her written closing statement on April 17, 2014, and Defendant filed its responsive closing statement on May 7, 2014. Dane filed a reply brief in support of her written closing statement on May 12, 2014. The Court finds the matter fully submitted and ready for disposition. Under Federal Rule of Civil Procedure 52(a), following a bench trial "tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."

## I.   FINDINGS OF FACT

After assessing the credibility of the trial witnesses and analyzing the exhibits offered into evidence, the Court finds the following facts by a preponderance of the evidence.

Dane was born on July 28, 1979, and is currently 34 years old. She was born in Cedar Rapids, Iowa, and graduated from Waverly-Shell Rock High School in 1997. In high school, Dane participated in soccer, basketball, track, softball, and was otherwise very active and

enjoyed running.  Dane continued to be physically active in college by running and working out at the gym; she also played soccer her freshman year.  Dane earned a bachelor of science degree in nursing from Coe College in Cedar Rapids, Iowa, in 2001.

Dane obtained her certification as a registered nurse (RN) and began working in the critical care unit at Mercy Hospital in Cedar Rapids, Iowa, after graduating from college, where she remained until October of 2002.  While in that position, Dane cared for patients who were on ventilators or had balloon pumps in their hearts, and she also worked with IV drips.  As a critical care unit RN, Dane was on her feet ten hours a day and was required to move patients in their beds as well as assist patients in getting out of their beds and transporting them from one place to another.

In the fall of 2002, Dane left her position at Mercy Hospital to work as a nurse in the United States Navy.  After officer training in Newport, Rhode Island, Dane was stationed at the National Naval Medical Center in Bethesda, Maryland, where she worked in the medical/ surgical unit.  In 2003, Dane was deployed to a hospital ship in the Persian Gulf for approximately eight weeks to take care of wounded soldiers in need of intensive care.  After returning to Bethesda, Dane worked in the medical/surgical unit and was eventually transferred to the post-anesthesia care unit.

While in the Navy, Dane had to undergo a physical readiness test every six months to determine her deployability and fitness for duty.  The physical readiness test included a mileand-a-half run, sit-ups, and push-ups.  Additionally, Dane utilized running and other forms of exercise as a stress-reliever.

Dane was later transferred to the National Naval Hospital at Camp Pendleton in California, where she initially worked in the intensive care unit.  While Dane was working at Camp Pendleton, she began experiencing pain in the front and lateral side of her left ankle while walking, which she learned was due to a bone cyst on her left distal tibia.  Dane underwent

2

elective surgery with Dr. Brad Ruetenik on August 25, 2006, to have the bone cyst removed. Within a few months after the surgery, Dane was off crutches and able to get around and was fully functioning by approximately November 2006.  Shortly after her surgery, Dane requested to be transferred out of the intensive care unit, and she was then placed in the mother/baby and obstetrics/gynecology unit.  During her time in that unit, Dane primarily worked on updating policies and other administrative duties, and eventually took care of babies in the nursery and assisted with a few deliveries.

At the end of her military service or shortly after she left the military, Dane experienced situational depression and was on medications for her depression for approximately six months. Dane was also treated for low back pain and a leaky heart valve during her time in the military.

Dane was honorably discharged from the Navy in March 2007, due to a myopic degeneration in her right eye, and returned to Iowa.  In 2008, Dane was given a 50 percent service-connected disability rating due to her myriad of health problems diagnosed while she was on active duty.  After her discharge from the military, Dane started running and trying to exercise again, but she noticed that she was running on her toes more frequently and getting shin splints during her workouts. Dane sought medical advice at the Iowa City Veterans Administration Hospital for her foot and ankle pain, but the doctors were unable to explain the source of Dane's pain and discomfort.

After returning to Iowa, Dane worked for the State of Iowa with the Center for Disaster Operations and Response, where she assisted with emergency planning for the state's critical care infrastructures.  That position did not involve any direct patient contact.  Dane worked in that capacity for two and a half years.  During that period of time, Dane also temporarily worked with the Department of Health and Human Services for the Disaster Medical Assistance Team for the State of Iowa, which involved providing emergency medical assistance during natural disasters.  In that capacity, Dane assisted in Galveston, Texas, after Hurricane Ike, as well as in

Fargo, North Dakota, after flooding in the area.  In Galveston, Dane ran a walk-in clinic where she primarily assisted with medication refills and other general patient care.  In Fargo, Dane again worked at a clinic with residents from skilled living and nursing facilities, and Dane only saw one or two patients during the brief period of time she was there.

Due to her ankle and leg pain and discomfort, Dane met with Scott Freschi, D.P.M. (Dr. Freschi), a podiatrist at the Des Moines Veterans Administration Hospital (VA).  Dr. Freschi determined that Dane had a bone spur at the end of her distal tibia that was likely causing her pain, and he recommended that Dane have surgery to remove the bone spur.  Dane asked Dr. Freschi whether there was anything he could do about her shin splints and the tightness she was having in her Achilles tendon that was causing her to run on her toes, and Dr. Freschi opined that there was a possibility that there may be a surgical answer for the problem.

Dane underwent surgery with Dr. Freschi to remove her bone spur on April 16, 2008.  During her surgery, Dr. Freschi removed the bone spur from Dane's distal tibia and also did a percutaneous lengthening of her Achilles tendon.  To lengthen Dane's Achilles tendon, Dr. Freschi essentially punctured holes into the tendon – two holes on one side and a third hole on the opposite side – while he had the open incision at the front of the ankle.  At one of her first post-operative appointments, Dr. Freschi removed Dane's splint and instructed her to use a walking boot and to start putting weight on her foot as she felt she could.  Dane waited until she began physical therapy to put weight on her foot, as she was uncomfortable doing so any earlier than that.

Dr. Freschi started Dane on physical therapy on May 8, with appointments to follow on May 13 and 19.  During those appointments, Dane did exercises and stretches to restrengthen the muscles in her ankle, and she worked her way from walking in a boot, to walking in a shoe with parallel bars or crutches, to walking without assistance and even using a leg press to further strengthen her leg muscles.  Dane experienced pain in her heel chord and noticed that her left

Achilles tendon was more slender than on the right.  She was unable to lift herself up on her toes using only her left leg, atrophy developed in her left calf, and she continued to experience pain and even numbness in her left heel.  Dane discussed these concerns with Dr. Freschi, who was unable to provide an answer or solution to the problems Dane was experiencing.

In September of 2009, Dane went to Des Moines University for a second opinion, where she was examined by Kevin Smith, D.P.M., FACFAS (Dr. Smith).  Dr. Smith watched Dane attempt to walk and opined that Dane's Achilles tendon was over-lengthened.  Dr. Smith informed Dane that her Achilles tendon could be surgically shortened, she could walk in high heels to see if the problem was corrected, or she could be placed in a cast for an extended period of time to see if the Achilles tendon tightened up on its own.

On September 28, 2009, Dane received her NSCA-Certified Personal Trainer designation. This certification required Dane to pass a test that determined she was fit to act as a personal trainer.  The certification permitted Dane to assist people with their fitness goals either one-on-one at home or in a gym setting.

In December 2009, Dane began working for the VA as the Methicillin-Resistant Staphylo-coccus Aureus Coordinator, later called the Multi Drug Resistant Organism Coordinator; she stayed in this position until March 2013. While at the VA, Dane was responsible for ensuring that the program requirements were being implemented and maintained within the hospital, including contact precautions, hand washing, numbers monitoring, data submissions, and other similar requirements.  Her role at the VA did not require very much walking, as she only occa-sionally completed rounds to check for appropriate signage and hand washing.  Dane did not engage in direct patient care except occasionally by phone.

Around the time she began working for the VA, Dane contacted the Mayo Clinic in Rochester, Minnesota (Mayo), and requested an additional opinion.  Dane was seen by Norman Turner, III, M.D. (Dr. Turner), in December of 2009, an orthopedic surgeon in the Department of

Surgery at Mayo.  After examining Dane, Dr. Turner opined that her Achilles tendon was over-lengthened and that the only remedy was to surgically shorten the tendon, recognizing that the outcome was unpredictable due to the length of time the tendon had been over-lengthened.  Dane underwent an Achilles tendon shortening surgery on February 26, 2010, with Dr. Turner.  During this surgery, Dr. Turner used a rear approach, wherein he accessed the Achilles tendon from the back of Dane's left ankle.

Post-surgery, Dane was placed in a splint initially, then casted for several weeks before being placed in a walking boot that she used with crutches for a period of time and later progressed to normal shoes through physical therapy.  Dr. Turner instructed Dane to keep all weight off of her left foot for at least ten weeks after her surgery.  Dane remained at the same functional level following her surgery with Dr. Turner as she had been prior to that surgery.

Dane then underwent a consultation with Phinit Phisitkul, MD (Dr. Phisitkul), at the University of Iowa Department of Sports Medicine, where Dr. Phisitkul opined that they could again try a tendon-shortening surgery or even replace her Achilles tendon with a tendon from Dane's big toe to see if that made a difference in her left foot functionality.

At Dane's one-year post-operative appointment at Mayo, Dane asked Dr. Turner if there were any other remedies for her situation, and Dr. Turner suggested another tendon-shortening surgery, again with no significant assurance of success.  Dane underwent the second Mayo surgery on September 16, 2011, and she again experienced little or no change in the functionality of her left foot.  She was last seen at Mayo in September 2012 for her one-year post-operative appointment, at which time Dr. Turner mentioned the possibility of using Dane's tendon from her big toe to replace her Achilles tendon, though Dr. Turner recommended that she refrain from further surgeries.

After leaving her employment at the VA, Dane briefly worked at Iowa Heart with Mercy in Des Moines at their electrophysiology clinic, where she engaged in patient education and other administrative tasks.

Dane started work with Iowa Orthopedics in Des Moines in June 2013 and was still employed at Iowa Orthopedics at the time of trial.  At Iowa Orthopedics, Dane is a phone triage nurse, and she answers the phone and works with patients to ensure their questions are answered regarding medications, post-operative incision sites, appointment dates, and similar matters.  She does not provide any hands-on patient care in her job at Iowa Orthopedics.  The last time Dane provided hands-on patient care in a full-time position was when she was on active duty in the Navy.

Dane's left heel hurts any time she is on her feet, and she experiences lingering aching and pain in her left heel a few times a month.  Dane's left foot has a diminished ability to push off the ground, which causes her to limp when she walks.  Due to her lack of full functionality in her left ankle, Dane is no longer able to run and is unable to walk without experiencing some type of pain.  Dane rarely wears anything other than tennis shoes on her feet because other shoes cause discomfort, and she hates the look of her legs due to the greatly diminished size of her left calf as compared to her right.  Dane also occasionally experiences pain in her knees, lower back, and hips every couple of months.  Dane occasionally takes over-the-counter medications to deal with pain and rarely takes leftover prescription pain medication.  She prefers to deal with the pain without medication whenever possible.

Dane owns a home where she lives by herself, and she does her own housework, lawn care, and snow removal, unless she is able to receive assistance or pay someone else to help with such work.  Dane is unable to work as a critical care nurse or in a medical/surgical unit role because she is incapable of providing physical support for patients as is necessary in such roles.

She is also unable to work as a personal trainer because her physical limitations sideline her ability to demonstrate exercises for clients.

On October 26, 2006, the VA issued a Disability Rating Decision[1] determining that Dane's evaluation for vocational rehabilitation was not established.  On May 23, 2007, the VA issued another Disability Rating Decision, granting that Dane had service-connected disabilities for her eye condition, her bone cyst removal surgery and the residual scar, bilateral tinnitus, hypertension, degenerative disk disease, facial acne, and left Achilles tendonitis.  The VA granted the bone cyst removal surgery and residual scar disabilities at the 10 percent effective rate, respectively, due to slight ankle disability and scar tissue following her bone cyst surgery in 2006.  The VA granted the degenerative disk disease disability at the 10 percent rate due to evidence of Dane's muscle spasms and somewhat limited flexion.  The VA granted the left Achilles tendonitis at the 0 percent effective rate, as the evidence indicated only mild tenderness of the left Achilles tendon with normal weight-bearing alignment and no evidence of swelling or inflammation.  The cumulative disability rate was determined to be 50 percent.

On May 13, 2008, the VA issued another Disability Rating Decision for Dane, finding service-connected disabilities for major depressive disorder, hypertension, bilateral tinnitus, degenerative disk disease, bone cyst residual scar and post excision residual issues, myopic degeneration, facial acne, and left Achilles tendonitis.  The VA granted findings of these disabilities at the 10 percent effective rate except for facial acne and left Achilles tendonitis, which were again found at the 0 percent effective rate.  The cumulative disability rate was determined to be 50 percent.

---

[1] Disability compensation is available to veterans who suffer from physical or mental disabilities due to injuries or diseases incurred or aggravated during the veteran's time in the military.  The determination of disability compensation for a veteran is set forth in a Disability Rating Decision after a veteran has applied for compensation.

On August 8, 2008, the VA issued a Disability Rating Decision for Dane, finding that her left Achilles tendonitis was a continuing disability at the 0 percent disabling level.  Her cumulative disability rate remained at 50 percent.  Notably, this Decision was issued following Dane's surgery with Dr. Freschi.  The Decision noted that two weeks after her surgery in April 2008, Dane reported that she was doing very well and had minimal pain and discomfort.  In June 2008, Dane reported that she was experiencing some discomfort in her left heel area, and later that month, she reported feeling numbness in the bottom of her left heel.  The Decision also noted that Dane reported that she had been able to resume walking and had returned to all activities and types of shoes by the time of her examination by the VA for her disability ratings to be evaluated.  Dane reported during her VA examination in July 2008 that she was able to walk a quarter of a mile and go up and down one or two flights of stairs without difficulty, though she experienced pain in her left foot, especially when walking barefoot.  Upon examination on July 2, 2008, Dane's range of motion was greater than 20 degrees of dorsiflexion, which the evaluating physician found to be a significant improvement from Dane's preoperative evaluation.

On February 2, 2012, the VA issued a Disability Rating Decision for Dane, granting a temporary evaluation of 100 percent disability effective February 26, 2010, through April 14, 2010, due to her surgery at Mayo and convalescence from the surgery while in a cast.  Thus, her disability rating was set at 50 percent from March 11, 2007, until February 26, 2010, at which point it went up to 100 percent.  Her disability rating then went back down to 50 percent on May 1, 2010.

On September 14, 2012, the VA issued a Disability Rating Decision for Dane, granting a temporary evaluation of 100 percent disability from September 16, 2011, until November 30, 2011, due to her second surgery at Mayo and convalescence from the surgery.  The VA further granted a 20 percent disability rating for Dane's left Achilles tendonitis starting December 1, 2011, thus providing for a total rating of 60 percent starting on December 1, 2011.

Based on the Disability Rating Decisions addressed above, Dane received the following benefit payments from the VA for service-connected disabilities.  She received $712 per month effective April 1, 2007, through December 1, 2007, corresponding to her 50 percent disability rate.  Dane received $728 per month effective December 1, 2007, through December 1, 2008, corresponding to her 50 percent disability rate.  She received $770 per month effective December 1, 2008, through March 1, 2010, corresponding to her 50 percent disability rate.  Dane received $2,673 per month effective March 1, 2010, through May 1, 2010, corresponding to her 100 percent disability rate.  She received $770 per month effective May 1, 2010, through October 1, 2011, corresponding to her 50 percent disability rate.  Dane received $2,673 per month effective October 1, 2011, through December 1, 2011, corresponding to her 100 percent disability rate.  She receive $1,009 per month effective December 1, 2011, through December 1, 2012, corresponding to her 60 percent disability rate.  Dane received $1,026 per month effective December 1, 2012, through December 1, 2013, corresponding to her 60 percent disability rate.  She received $1,041.39 per month, effective December 1, 2013, through February 1, 2014, corresponding to her 60 percent disability rate.  Dane has received a total of $76,266.78 from the VA for service-connected disabilities, including issues arising with her left Achilles tendon, both before and after her surgery at the VA with Dr. Freschi on April 16, 2008.

Dane's recorded weight during a medical examination at Camp Pendleton on August 8, 2006, was 160 pounds.  This was a few weeks before her August 25, 2006, surgery to remove a bone cyst.  Dane's weight during her examination on March 5, 2008, was 198.4 pounds.  This was a few weeks before her April 16, 2008, surgery with Dr. Freschi.  Her weight during examination on April 10, 2013, was 217 pounds.  Dane gained approximately 40 pounds after her surgery at Camp Pendleton.  She then gained approximately 20 pounds after her surgery with Dr. Freschi.

Dane testified that she went into the surgery with Dr. Freschi not knowing if he was going to do the tendon lengthening and not knowing what procedure he would use and the associated risks. Dane signed an informed consent form on March 7, 2008, prior to her surgery with Dr. Freschi on April 16, 2008, in the record as Defendant's Exhibit K. The procedure is identified as "tendon lengthening of midfoot, rearfoot or ankle" as well as "excision of bone cyst." Def. Ex. K, p. 1. The specific procedure for the tendon lengthening is not further discussed. In the known risks section for the tendon lengthening procedure, the document includes tendon weakness, infection, scarring, chronic pain, binding down of the tendon to the underlying soft tissue, numbness, delayed wound healing, and recurrence.

Dane's annual salary at the time of trial was approximately $52,000. She has a life expectancy of 47.71 years according to the 2001 Commissioner's Standard Ordinary Mortality Tables, Iowa Code. Dane has paid approximately $6,000 in out-of-pocket medical expenses.

Additional record evidence involving medical observations and opinions is essentially unchallenged in this record. Thus, that evidence will be discussed as a part of the Court's conclusions of law.

## II.   CONCLUSIONS OF LAW

### A.   Applicable Law

[Federal] district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The United States is liable under the Federal Tort Claims Act "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. "The [Federal] Tort Claims Act incorporates, as the substantive standard to be

applied, the law of the state in which the tort was committed." <u>Manko v. United States</u>, 830 F.2d

831, 836 (8th Cir. 1987).

> The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances.  It is evident that the Act was not patterned to operate with complete independence from the principles of law developed in the common law and refined by statute and judicial decision in the various States.  Rather, it was designed to build upon the legal relation-ships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the general interstitial character of federal law.

<u>Richards v. United States</u>, 369 U.S. 1, 6 (1962).  Courts deciding claims brought under the

FTCA are required to apply "the whole law of the State where the act or omission occurred." <u>Id.</u>

at 11.  "[W]here the forum State is the same as the one in which the act or omission occurred,

our interpretation will enable the federal courts to treat the United States as an individual would

be treated under like circumstances." <u>Id.</u> at 12.

In negligence actions in Iowa, the plaintiff must prove "(1) the existence of a duty;

(2) failure to exercise reasonable care; (3) factual cause; (4) physical harm; and (5) harm within

the scope of liability (previously called 'proximate cause')." <u>Hill v. Damm</u>, 804 N.W.2d 95, 99

(Iowa Ct. App. 2011) (citing Restatement (Third) of Torts: Liab. Physical Harm § 6 cmt. B,

at 67-68 (2010); <u>Thompson v. Kaczinski</u>, 774 N.W.2d 829, 836 (Iowa 2009)).  Medical negli-

gence is the failure to "use the degree of skill, care and learning ordinarily possessed and exer-

cised by other physicians in similar circumstances."  Iowa Civil Jury Inst. 1600.2; <u>see, e.g.,</u>

<u>Speed v. Iowa</u>, 240 N.W.2d 901 (Iowa 1976).

In Iowa, "causation has two components: cause in fact and legal cause." <u>Thompson</u>, 774

N.W.2d at 836.  "Conduct is a factual cause of harm when the harm would not have occurred

absent the conduct." <u>Hill</u>, 804 N.W.2d at 103 (quoting Restatement (Third) of Torts § 26, at

346). Legal, or proximate, cause[2] "requires a policy determination of 'whether the policy of the law must require the defendant to be *legally responsible* for the injury.'" Thompson, 774 N.W.2d at 836 (quoting Gerst v. Marshall, 549 N.W.2d 810, 815 (Iowa 1996)). "The assessment of scope of liability under the Restatement (Third) no longer includes a determination of whether the actor's conduct was a substantial factor in causing the harm at issue, a question properly addressed under the factual cause rubric." Id. at 837-38 (citing Restatement (Third) of Torts § 27 cmt. J, at 427-29). "[A]n actor's liability is limited to the physical harms that result from the risks that make an actor's conduct tortious." Mitchell v. Cedar Rapids Cmty. Sch. Dist., 832 N.W.2d 689, 699 (Iowa 2013). The third Restatement "scope-of-liability analysis [is used] to avoid unjustified liability and to confine liability in a way consistent with the reasons for holding an actor liable in the first place." Id. "Scope-of-liability determinations are fact-intensive, requiring consideration of the risks that make an actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks." Id. "If the harm is no more likely to occur than if the actor desisted from the tortious conduct, the harm is not within the scope of the actor's liability . . . ." Royal Indem. Co. v. Factory Mut. Ins. Co., 786 N.W.2d 839, 851 (Iowa 2010) (quotation marks and citation omitted).

With regard to damages, the law in Iowa states that

[I]n an action for damages for personal injury against a . . . podiatric physician . . . based on the alleged negligence of the practitioner in the practice of the profession or occupation . . . in which liability is admitted or established, the damages awarded shall not include actual economic losses incurred or to be incurred in the future by the claimant by reason of the personal injury . . . to the extent that those losses are replaced or are indemnified by insurance, or by governmental, employment, or service benefit programs or from any other source.

---

[2] Also termed "scope of liability" in the third Restatement. See Thompson, 774 N.W.2d at 837.

Iowa Code § 147.136.  Therefore, Dane's damages award may be reduced by the amount of benefits she has received and will receive in the future from the Veterans Administration, as the collateral source rule does not apply to such benefits.

## B.  Liability

As articulated in its brief, Defendant stipulated that Dr. Freschi violated the applicable standard of care in his treatment of Dane by sending her to physical therapy too soon after her surgery in 2008.  Additionally, Defendant concedes that the unrebutted evidence supports a finding that Dr. Freschi violated the applicable standards of care by

> (1) performing an inadequate assessment of the heel cord shortening prior to surgery; (2) performing a percuntaneous [sic] or a blind Achilles tendon procedure on a young, active patient; (3) over-lengthening Dane's left Achilles tendon during the April 16, 2008, surgery at [the] VA; (4) failing to immobilize the left leg sufficiently to allow proper healing; and (5) failing to recognize or deal with the complication of an over-lengthened Achilles tendon.

Def. Post-Trial Br. p. 10, ECF No. 31.  However, the causation element between Dr. Freschi's negligent actions and Dane's complaints of pain and other harms has not been stipulated to the parties.  The Court therefore must examine the specific factual circumstances in this case to determine whether Dr. Freschi's negligence was the factual and proximate cause of each of Dane's claimed injuries.

Dane's permanent physical injuries allegedly caused by Dr. Freschi's negligent conduct include the following:  (1) substantial diminishment of the girth of her left calf; (2) alteration of her gait such that she walks with a limp; (3) inability to stand on her left foot and push off the floor; (4) pain in her low back, hips, knees, sole of her left heel, left heel cord, and in the front of her left ankle; (5) difficulty sitting for more than a half hour without experiencing low back pain;

(6) difficulty sleeping through the night; (7) pain and discomfort when wearing shoes other than tennis shoes; and (8) weight gain due to an inability to exercise.

Dr. John Kuhnlein assessed Dane on April 10, 2013, and reported that her left lower extremity was 28 percent permanently, partially disabled; he also reported an 11 percent permanent, partial disability for her whole body. Dr. Kuhnlein measured Dane's calf girth at 47 cm for the right calf and 41 cm for the left calf. Dr. Kuhnlein reported that Dane walked with a slight limp on her left side, had weakness in her left foot when pushing off the ground, and had problems with her heel gait due to her tight Achilles tendon. Dr. Kuhnlein noted that an impairment assessment for Dane's hip and back were not appropriate at the time of his examination of Dane, as Dane's hip and back conditions had not reached maximum medical improvement at that time. Dr. Kuhnlein concluded that based on her ankle condition, Dane would be capable of lifting 30 pounds occasionally from the floor to her waist, 40 pounds occasionally from her waist to her shoulder, and 30 pounds occasionally over her shoulder. Dr. Kuhnlein assessed that Dane should work on ground level, avoiding ladders and scaffolding, and that she may need to use a tandem gait to use stairs.

Dr. Rothstein opined at trial that Dr. Freschi deviated from the appropriate standards of medical care when he inadequately assessed Dane's heel cord during surgery before lengthening her Achilles tendon, as well as when he performed a percutaneous Achilles tendon lengthening. According to Dr. Rothstein, the procedure used by Dr. Freschi was not only an inappropriate procedure to use, but it was also done incorrectly because Dr. Freschi allowed Dane's Achilles tendon to lengthen at fifteen degrees, when it should never be lengthened past ten degrees. Dr. Rothstein then explained the permanent consequences of Dr. Freschi's negligence with regard to Dane's physical abilities and pain. Dr. Rothstein concluded that Dane's left calf atrophy, lack of

push-off strength in her left foot, uneven gait, and difficulty walking up and down stairs are all permanent effects of the improper Achilles tendon lengthening procedure.

Dr. Rothstein concluded that Dane's back, hip, and ankle pain may be a result of her surgery with Dr. Freschi, but they could also be a result of her prior surgery at Camp Pendleton or potentially due to undiagnosed issues of which Dr. Rothstein was unaware. Dr. Rothstein assessed that Dane's heel cord pain and inability to run are definitely related to her Achilles tendon surgery because she walks with a calcaneous gait and cannot physically push off of the ground with her left foot, and she therefore experiences pain with each step. Dr. Rothstein concluded that over time, Dane's disability should worsen, and she may require a form of bracing to aid in walking due to muscle fatigue. Dr. Rothstein did, however, note that Dane's prior surgery at Camp Pendleton could also have caused some of Dane's arthritis and similar issues over time.

Notably, Dr. Rothstein had not reviewed Dane's medical records from her surgery at Camp Pendleton nor the records indicating Dane's reports of pain prior to her treatment by Dr. Freschi; and he had never independently examined Dane before coming to his conclusions. Thus, he was unable to assess whether Dane's current complaints of pain and injuries were solely based on Dr. Freschi's negligent conduct or whether they were caused in whole or in part by pre-existing conditions or her initial surgery while in the Navy.

Dr. Weil concluded at trial that Dr. Freschi violated the applicable standards of medical care when Dr. Freschi made three cuts into Dane's Achilles tendon. Dr. Weil determined that only one cut would have lengthened the tendon sufficiently to correct Dane's dorsiflexion; the extra two cuts served to over-lengthen Dane's tendon far beyond what Dr. Weil believes was necessary. Dr. Weil also concluded that Dr. Freschi should have re-assessed Dane's ankle several weeks into physical therapy when it became evident that Dane's Achilles tendon had been overlengthened.

As with Dr. Rothstein, Dr. Weil had not been provided with Dane's medical records from Camp Pendleton regarding her 2006 surgery or her records between the 2006 surgery and her treatment by Dr. Freschi.  Dr. Weil did not recall reviewing Dane's mental health records or the VA Disability Rating Decisions.  Further, Dr. Weil did not have any information about Dane's medical history prior to her surgery at Camp Pendleton.  Neither Dr. Rothstein nor Dr. Weil were aware that Dane was diagnosed with Achilles tendonitis, tenosynovitis, or a degenerative back condition prior to her treatment by Dr. Freschi.

Based on the record, the Court finds that Dr. Freschi's care and treatment was below the standard of care and constituted medical negligence that factually and proximately caused the substantial diminishment of the girth of Dane's left calf, alteration of Dane's gait such that she walks with a permanent limp, and Dane's inability to stand on her left foot and push off the floor.  The record does not support a finding that the rest of Dane's complaints of pain and weight gain were entirely caused by Dr. Freschi's negligence; rather, the record supports a finding her pain is partially attributable to Dr. Freschi's actions, and the Court cannot exclude that her pain is partially attributable to conditions existing prior to her surgery with Dr. Freschi.

The Court finds that Dane did consent to the tendon lengthening surgery performed by Dr. Freschi and received legally sufficient information about possible risks of the procedure prior to her surgery.  See Estate of Anderson ex rel. Herren v. Iowa Dermatology Clinic, PLC, 819 N.W.2d 408, 416 (Iowa 2012), citing Pauscher v. Iowa Methodist Med. Ctr., 408 N.W.2d 355, 360 (Iowa 1987).

Dane contends that she has gained 40-60 pounds since she was treated by Dr. Freschi; however, this is unsupported by the record.  Dane gained approximately 40 pounds after her surgery at Camp Pendleton, and she gained approximately 20 pounds between her surgery with

Dr. Freschi and her examination in April 2013.  Records indicate Dane gained the initial 40 pounds over a period of approximately 19 months and gained the additional 20 pounds over a period of approximately 4 years.  Prior to her surgery with Dr. Freschi, Dane was unable to exercise as she desired due to pain in her left ankle.  The evidence presented at trial does not support a finding that absent Dr. Freschi's negligent conduct Dane would have been restored to her desired level of physical activity; this Court therefore cannot attribute Dane's inability to exercise or her weight gain to Dr. Freschi's negligence.

### C.  Damages

#### a.  Past Medical Expenses

The parties agree that Dane has paid $6,000 out of pocket for past medical expenses; the evidence supports this finding.  The Court therefore awards Dane $6,000 in past medical expenses.

#### b.  Past Lost Income

The evidence illustrates that Dane voluntarily applied for and accepted several positions working in administrative roles as a nurse, rather than seeking out positions where she would have direct patient contact or where she could utilize her certification as a personal trainer.  Although she testified at trial that she would like to have the option of working in direct patient care positions or as a personal trainer and that critical care and intensive care nursing is her favorite area in which to work, she also testified that when she left the Navy she sought administrative positions because she wanted a change in her career at that point.  The evidence does not support a finding that Dane lost job opportunities following her surgery with Dr. Freschi due to any injuries associated with that surgery; rather, Dane did not, at that time, demonstrate an

interest in positions requiring direct patient care such that her income would have exceeded her actual income from 2008 to present.  Any other career paths remain too speculative in the record. The Court therefore denies Dane's request for past lost income.

### c.  Past Loss of Full Body Function

Dr. Kuhnlein evaluated Dane and found that she had a whole body permanent partial disability of 11 percent and a left lower extremity permanent partial disability of 28 percent. Dane therefore requests $10,000 per year, at a minimum, for the past loss of her full body function, with a total of at least $60,000.  However, Dane fails to incorporate the payments she has received from the Veterans Administration in the form of disability payments for service-connected disabilities that are directly related to her complaints of pain in this matter.

Dane was rated at 10 percent service-connected disability due to her bone cyst removal surgery, effective March 11, 2007.  She was rated at 10 percent service-connected disability due to the scar from her bone cyst removal surgery, effective March 11, 2007.  Dane was rated at 10 percent service-connected disability due to her degenerative disk disease in her lumbar spine, effective March 11, 2007.  She was rated at 10 percent service-connected disability due to her major depressive disorder effective March 11, 2007.  Dane was rated at 0 percent service-connected disability due to her Achilles tendonitis, effective March 11, 2007, with increases to 100 percent disability ratings February 26, 2010, to May 1, 2010, and September 16, 2011, to December 1, 2011, and then a decrease to 20 percent disability rating December 1, 2011, to present.  Dane was rated at 0 percent service-connected disability due to her residual scar from her left Achilles lengthening and shortening surgeries associated with her service-connected left Achilles tendonitis, effective February 26, 2010.

A bilateral factor is applied to diagnostic codes 7804 and 5262 from March 11, 2007, through December 1, 2011, which refers to Dane's service-connected disability ratings for her bone cyst surgery and the corresponding scar.  <u>See</u> 38 C.F.R. § 4.26.[3]  A bilateral factor is also applied to diagnostic codes 5271, 7804, and 5262 from December 1, 2011, to present, which refers to Dane's service-connected disability ratings for her bone cyst surgery and the corresponding scar as well as her left Achilles tendonitis.  <u>Id.</u>

The Court finds that only part of Dane's loss of full body function is associated with Dr. Freschi's negligent conduct.  While the record is insufficient to precisely categorize the causes of limitations on body function, the totality of the record causes the Court to reduce her requested

---

[3] Section 4.26 states as follows:

When a partial disability results from disease or injury of both arms, or of both legs, or of paired skeletal muscles, the ratings for the disabilities of the right and left sides will be combined as usual, and 10 percent of this value will be added (i.e., not combined) before proceeding with further combinations, or converting to degree of disability.  The bilateral factor will be applied to such bilateral disabilities before other combinations are carried out and the rating for such disabilities including the bilateral factor in this section will be treated as 1 disability for the purpose of arranging in order of severity and for all further combinations.  For example, with disabilities evaluated at 60 percent, 20 percent, 10 percent and 10 percent (the two 10's representing bilateral disabilities), the order of severity would be 60, 21 and 20.  The 60 and 21 combine to 68 percent and the 68 and 20 to 74 percent, converted to 70 percent as the final degree of disability.

(a) The use of the terms "arms" and "legs" is not intended to distinguish between the arm, forearm and hand, or the thigh, leg, and foot, but relates to the upper extremities and lower extremities as a whole.  Thus with a compensable disability of the right thigh, for example, amputation, and one of the left foot, for example, pes planus, the bilateral factor applies, and similarly whenever there are compensable disabilities affecting use of paired extremities regardless of location or specified type of impairment.

(b) The correct procedure when applying the bilateral factor to disabilities affecting both upper extremities and both lower extremities is to combine the ratings of the disabilities affecting the 4 extremities in the order of their individual severity and apply the bilateral factor by adding, not combining, 10 percent of the combined value thus attained.

(c) The bilateral factor is not applicable unless there is partial disability of compensable degree in each of 2 paired extremities, or paired skeletal muscles.

38 C.F.R. § 4.26.

amount by 50 percent for past loss of full body function.  Additionally, the Court reduces Dane's damages by $15,992.40, the amount Dane has received in disability benefits from the Veterans Administration for her Achilles tendonitis.[4]  The Court therefore awards Dane $14,007.60 in damages for past loss of full body function.

### d.  Future Loss of Full Body Function

Dane requests $10,000 per year, at a minimum, for the remainder of her current life expectancy of 47.71 years, with a total of at least $471,000.  Dr. Kuhnlein evaluated Dane and found that she had a whole body permanent partial disability of 11 percent and a left lower extremity permanent partial disability of 28 percent.  As Dane's loss of body function is only partially due to Dr. Freschi's negligent conduct, the Court finds by a preponderance of the evidence that 50 percent of Dane's requested damages is warranted.  Additionally, Dane is set to receive 20 percent disability benefits for her Achilles tendonitis, so the Court finds that her damage award should be further reduced to prevent double-recovery.  The Court therefore finds that a damages award of $119,306.68 is supported by the evidence for Dane's future loss of full body function.

### e.  Past and Future Physical and Mental Pain and Suffering

Dane requests damages associated with her past and future physical pain, emotional distress, and impairment in her activities of daily living.  She testified that in addition to her physical pain, she is embarrassed by the appearance of her calves and her uneven gait and that

---

[4] Dane received disability benefits at the 20 percent effective rate for her Achilles tendonitis December 1, 2011, to February 1, 2014, which calculates out to $5,300.40.  Additionally, she received disability benefits at the 100 percent effective rate for her Achilles tendonitis March 1, 2010, to May 1, 2010, and October 1, 2011, to December 1, 2011, for the periods of time she was undergoing and recovering from her two surgeries at Mayo; those sums equal $10,692.

she is unable to wear high heels.  Dane also asserts that she has experienced bouts of depression due to her calf atrophy and limp.

With regard to Dane's physical pain, the evidence shows that Dane was experiencing pain prior to her surgery with Dr. Freschi, so the Court must again assess what portion of Dane's current complaints of pain can be attributed to Dr. Freschi's negligence.  The Court finds that the atrophy of Dane's left calf is directly related to Dr. Freschi's negligent conduct, as is Dane's uneven gait, as she did not suffer from either of these impairments in any way prior to her surgery with Dr. Freschi, and they are directly related to the lack of functionality in her Achilles tendon.  Although her uneven gait and pain associated with walking in high heels likely makes it difficult or impossible for Dane to wear high heels, the evidence fails to show that Dane was capable of wearing high heels prior to her surgery with Dr. Freschi when she was already experiencing difficulties ambulating properly without pain when walking and running.  The evidence illustrates that Dane was battling depression when she left the Navy before her surgery with Dr. Freschi and also that she has been and will continue to be compensated by the Veterans Administration in the form of disability benefit payments, as her major depressive disorder is considered a service-connected disability effective at a rate of 10 percent since March 11, 2007. Dane's activities of daily living have been impaired by Dr. Freschi's negligence, though the Court finds that some of her complained-of impairments are partially attributable to conditions existing prior to Dr. Freschi's actions, including Dane's inability to participate in sports or run and her difficulties walking or navigating stairs without pain.

The Court finds that the evidence supports a damages award of $29,105.30 for Dane's past physical and mental pain and suffering, since the Court cannot exclude that a portion of Dane's pain and suffering is attributable to pre-existing conditions at the time of her surgery with Dr. Freschi.  This total reflects a reduction of $894.70 for benefits Dane has already received due to her service-connected major depressive disorder since her surgery with Dr. Freschi.

On a like basis, the Court finds that the evidence supports a damages award of $70,188.88 for Dane's future physical and mental pain and suffering.  This total reflects a reduction of $29,811.12 for benefits Dane is set to receive in the future due to her service-connected major depressive disorder.

### f.   Loss of Future Earning Capacity

Dane requests that the Court grant her $300,000 in damages for loss of future earning capacity because she is unable to work as a critical care or intensive care nurse and is unable to use her personal trainer certification.  Dane testified at trial that she greatly enjoyed working as a critical care or intensive care nurse and that she also would like to eventually use her certification to work as a personal trainer.  Dane's request is calculated based on the pay difference between such positions and the types of administrative nursing positions she can handle physically following her ankle surgeries.

"The right to damages for impairment of earning capacity may be otherwise classified as impairment of ability to work and earn."  Bergquist v. Mackay Engines, Inc., 538 N.W.2d 655, 659 (Iowa Ct. App. 1995).  "Impairment of physical capacity creates an inference of lessened earning ability in the future . . . [and t]he basic element to be determined in the matter of claimed impairment of future earning capacity is the reduction in value of the power to earn, not the difference in earnings received before and after the injuries."  Id. (internal citation omitted). However, the Court must also consider "evidence of wages and earnings of plaintiff prior to the injury," id., as "[t]he measure of damages for loss of earning capacity is the difference between the value of an individual's services, if working, as [s]he would have been but for the injury, and the value of the services of an injured person, if working, in the future," Sallis v. Lamansky, 420 N.W.2d 795, 798 (Iowa 1988) (quotation marks and citation omitted).

Dane was working in an administrative capacity prior to her surgery with Dr. Freschi, as she desired a career change.  This voluntary decision to end working as a critical care or

23

intensive care nurse prior to the negligent conduct at issue rebuts Dane's statement of her desire to work in direct-contact positions with patients like she did early in her nursing career.  Whether Dane would have taken a job in the future as a critical care or intensive care nurse, or as a personal trainer, had she not undergone surgery with Dr. Freschi, is therefore speculative at best.  However, "it is the loss of earning *capacity* that is compensable, not the loss of earnings." Vasconez v. Mills, 651 N.W.2d 48, 57 (Iowa 2002).  "A [factfinder] may infer from an impairment of physical capacity a corresponding lessening in future earning ability."  Id.

The evidence establishes that Dane is no longer capable of performing required duties of critical care and intensive care nurses, and she is also unable to work as a personal trainer because she cannot perform the exercises she would request of potential clients.  However, Dane is capable of performing administrative nursing roles, like those she has held since before she underwent surgery with Dr. Freschi.  Her work in administrative nurse positions were voluntarily chosen by Dane because she desired a career change.  Assessment of lost future earning capacity escapes precise determination both because of the inherent unpredictability of future earning opportunities and given career choices reflected in this record.  However, the Court finds that a damages award of $47,710 is warranted in this record to compensate Dane for her loss of future earning capacity.

## III.   DAMAGES SUMMARY

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $6,000 in past medical expenses for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is not entitled to damages for past lost income for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $14,007.60 in past loss of full body function for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $119,306.68 in future loss of full body function for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $29,105.30 in past physical and mental pain and suffering for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $70,188.88 in future physical and mental pain and suffering for Defendant's violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that Dane is entitled to recovery of $47,710 in loss of future earning capacity for Defendant's violation as alleged in Count One.

## IV.   ORDER

For the reasons stated, the Court finds in favor of Plaintiff Jennifer Dane and against Defendant United States of America on Dane's claim under the Federal Tort Claims Act.  The Court specifically finds that Dane is entitled to damages in the amount of $286,318.46, plus post-judgment interest pursuant to 31 U.S.C. § 1304(b)(1)(A).[5]

---

[5] "Interest shall be allowed on any money judgment in a civil case recovered in a district court," and it "shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually."  28 U.S.C. § 1961(a) and (b).  Title 31 U.S.C. § 1304(b) states that "(1) interest may be paid from the appropriation made by this section – (A) on a judgment of a district court, only when the judgment becomes final after review on appeal or petition by the United States Government, and then only from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance . . . ."  As set forth by the Eighth Circuit in United States v. Wilson, 926 F.2d 725, 727-28 (8th Cir. 1991), the government's liability for post-judgment interest runs from "the date the General Accounting Office receive[s] a copy of the district court's judgment . . . [to] the day before the date of th[e appellate] court's mandate of affirmance."

The Clerk of Court is hereby ordered to enter judgment in favor of Plaintiff Jennifer Dane and against Defendant United States of America.

**IT IS SO ORDERED.**

Dated this 11th day of June, 2014.

JAMES E. GRITZNER, Chief Judge
U.S. DISTRICT COURT